The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons who have any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw a net and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning, Ms. Lawrence. Good morning. Good morning, Your Honors, and may it please the Court. My name is Astrid Ceballos and I represent Mr. Mixell. Mr. Mixell asks this Court to vacate his conviction under SORNA because his prior organ offense is not a categorical match for possession of child pornography and is not a contact offense. The first issue is whether possession, production, or distribution of child pornography, as set out in 20911 7G, encompasses Mr. Mixell's organ offense. Mr. Mixell argued the categorical approach applies to G, and that approach requires the Court to match the federal definition of possession of child pornography under SORNA with the organ offense under which he was convicted. The organ offense of encouraging child abuse in the second degree makes it a crime for a person to, quote, knowingly possess or control or knowingly access with the intent to view a visual recording of sexually explicit conduct involving a child for the purpose of arousing or satisfying the sexual desires of the person or another person. Counsel, I have a question. We've already decided in a case called Price that subsection I uses the circumstance-specific approach, which I believe the District Court also applied to Mr. Mixell. Wouldn't that end the issue here? The Court in Price applied the circumstance-specific approach to section I, and the section that… I guess my question is, does it make any difference whether we would also use G and H since I applied to him and the Court's already established that? So, in Berry, this Court found that generally when a federal statute refers to a generic offense, that text shows Congress's intent that the categorical approach be applied. And recently, this Court affirmed in Helton that the SMART guidelines can and do have the force and effect of law. The SMART guidelines with respect to section G say that… The SMART guidelines say that in general, jurisdictions are not required by SORNA to look beyond the elements of the offense of conviction except with respect to victim age. So even if this Court finds that Price applies to I, that the circumstance-specific approach applies to that residual clause, it shouldn't apply to G because the language of G, possession, production, or distribution of child pornography, doesn't show any intent that the circumstance-specific approach be applied. So we should go to the default. If I applies to Mixell, do we need to reach G and H necessarily? So even if this Court finds that the circumstance-specific approach in Price applies to the residual clause, Mr. Mixell's offense doesn't qualify under the residual clause. So again, we have to look at the SMART guidelines. And the definition in the SMART guidelines says that the final clause covers any conduct that by its nature is a sex offense against a minor, and that's intended to ensure coverage of convictions under statutes defining sexual offenses in which the status of the victim is a minor, is an element to the offense, such as specially defined child molestation or child prostitution offenses, and other offenses prohibiting sexual activity with underage persons. So those definitions accord with the case examples that we have in our brief at page 20. Each of those involve the defendant engaging in a sexual act while interacting directly with a minor. So go field. And Mixell's offense doesn't involve any of these. It doesn't involve sexual activity with underage persons. So counsel, your point is if you apply just I, even using circumstance-specific, you still have to deal with conduct, correct? And by its nature, sexual offense against a minor. We don't necessarily have that here, do we? Is that your point? Yes, that's correct. That's correct. That this is the organ offense that Mr. Mixell was convicted under does not involve the kind of sexual activity and conduct that the SMART guidelines tell us I was intended to cover. And G, which talks about possession and production of child pornography, has to mean something in and of itself. So to interpret I so broadly as to encompass any state offense that might not fall categorically into the federal generic definition of child pornography would render G superfluous. So we get to G. If we use G and use categorical approach, your position is that organ statute is broader than the federal statute of child pornography? Is that your position? Yes, that's correct. That's correct. Sorry. No, go ahead. Go ahead. The organ offense, it refers to sexually explicit conduct, and that's defined in organ revised statutes 163.665 to include the lewd exhibition of sexual or other intimate parts. And under organ law, other intimate parts includes breasts. So the least serious conduct that the organ statute prohibits is possessing an image of the bare breasts of a teenage girl. But that's broader than the federal definition of the under SORNA. That's because even though SORNA doesn't define child pornography, again, it has to have some meaning. And we can perhaps look to Section 2256.8 where Congress defined child pornography for federal purposes. And in that statute, sexually explicit conduct is much narrower than what the organ statute allows. So at the federal level, sexually explicit conduct. Counsel, are you saying that organ, just because only breasts are shown, it can never be pornography? Are you saying that's the organ statute? It said showing the breasts alone may not be. But are you saying that if you only show in terms of intimate part the breasts, that that depiction can never be child pornography? Is that your representation about organ law? I think that when you're using the catechol approach, you have to look at the least serious conduct that the state offense would prohibit. And in this case, that would be, yes, showing the bare breasts of a teenage girl. And that would not fit under the federal generic definition of child pornography. So while we may think that that should qualify as child pornography, Congress did not make its intent clear that in SORNA it wanted to apply a different definition than what we have in the federal statute prohibiting possession of child pornography. And in the SMART guidelines, it also refers to sexually explicit visual depictions as being what SORNA is trying to prohibit. And the use of the language sexually explicit there matches the language in 2256. So even if the court finds that we shouldn't import 2256 directly into SORNA, we can still use it as a reference point because of the similarities in the language there to define the federal generic defense of child pornography possession. What if we applied the circumstance specific to G? Do you think you have any plausible defense in this case? I think if we apply the circumstance specific approach to G, that this court would still have to tell us what possession of child pornography means. Who knows what that means? No one knows what it means. Have you heard about being able to define what it means? What child pornography means? Fortunately, I don't think it's my job to define that. I didn't ask you to define that. I said, who knows? You're just saying you don't know. Right. I don't know. I would say that it is the best guess we have is that it's the definition laid out in 2256-8 with the corresponding sexually explicit conduct definition. But my point is, I guess, that even if we apply the circumstance specific approach, we need to know what possession of child pornography means. And so if this court finds that the circumstance specific approach applies and gives us that definition, then we should remand to the district court to see whether Mr. Mikesell's offense, Oregon offense, what the actual conduct was fits that definition. But we know what the conduct was. He was depicting. He was he possessed by the use of a computer photographs or motion pictures depicting a child engaged in a sexual act. We know what that was. You're telling me that we don't actually know. Go ahead. I was just going to say, I'm sorry. I'm sorry. I know it's difficult. Go ahead. I won't cut you off. We don't know what the what the image is actually depicted. So, again, just because since under the Oregon statute, the definition of we do know, we do know. We do know, counsel, it was a child engaged in sexual conduct. We do know that. And we know that you say we don't. We're deprived of even the definition of sexual, engaged in sexual conduct, too. Well, so if this court finds that the district court's approach to defining possession of child pornography is what the district court said it was, and that the circumstance specific approach applies, only then would we concede that that that addresses this question, that his offense does does fit within the within section. Yeah, I think you almost have to. Yes. Go ahead. That's all the questions I have. Go ahead. Which argument? I was just going to say, but if if we in general, when Congress refers to an offense, we we don't just substitute any whatever a state calls a particular offense into into that slot. So the definite when when Sorna refers to possession of child pornography must have some independent definition and meaning. So that's why the there should be a separate. Even if the categorical approach doesn't apply in the circumstance, specific approach does that should have its own separate meaning. And that's why we would say we should remand to the to the district court to figure out whether it would fit that federal generic definition. Instead of just assuming that any state offense that's called child pornography would automatically fit. I'd also like to discuss Mr. Mike's supervised release conditions. Of course, if the court agrees that his conviction or Sorna must be vacated, the court doesn't need to reach this issue. But the district court erred in imposing the condition requiring him to participate in the computer and Internet monitoring program. As a special condition of his supervision, because it requires a greater deprivation of liberty than is reasonably necessary. So the perpetual monitoring of his Internet usage deprives him of more liberty than necessary for a few reasons. One is, as the Supreme Court has found in Packingham, Internet usage is integral to First Amendment rights and access to the Internet is critical. Counsel, the Packingham was a complete prohibition on use of a computer and access to the Internet. And as I understand the conditions here, Mr. Maxell would have free access to the Internet. And there's a monitoring function because his crime involved the use of the Internet. And it's a five year supervised release. It's not lifetime. Why is that such a significant deprivation of liberty? Yeah, it's true that he can still use the Internet. But the constant monitoring of Internet use would reveal all of his personal communications contemporaneously. That would show his free speech and association rights. And that's why it's more of a deprivation that is necessary. Recently, this court found in Shiraz that not having enough of an explanation why lesser restrictions couldn't accomplish the same. Counsel, I have a question. Ms. Collis, what type of restriction would you say is appropriate then? Because it seems to me here the trial court tailored things pretty well in putting the five year limitation on and allowing him the use of the Internet. He can't go on anonymously. But other than that, he does have the right to use it. So what kind of restriction would you say be reasonable, assuming that the conviction is upheld? So the district court actually did impose some other special conditions that we haven't challenged in this appeal that would accomplish the same objectives of protecting the public. And that would be tailored to the defendant's particular characteristics and past offense using the computer without unduly infringing his rights. So specifically conditions L&M authorized the probation officer to subject him to unannounced, random, periodic searches without reasonable suspicion of his computer and his Internet use. So it would be similar to a random urine screen condition for someone convicted of a drug offense. And together with other conditions requiring him to submit to a sex offender mental health assessment, comply with any sex offender treatment that he's prescribed and submit to polygraph testing to monitor his compliance with the terms of his release. Yes. Well, excuse me. So is it your position that any real time monitoring is a violation of his First Amendment rights? Yes, that's my position that if we look at other cases like United States versus Jones and Riley versus California, the court has found that, you know, accessing a person's cell phone, including the Internet usage data and conducting long term GPS surveillance of a person's public movements. That would infringe on expectations of privacy. And part of the reason for that is that the law enforcement is not resource constrained. So in the past, where those kinds of things might actually require a person, I see my time has expired. May I take a few minutes to finish? Yes, you may. You may. She is. I am, Your Honor. Well, Ms. Lawrence, would you please come to the podium and give an introduction to the student? And as we normally do for the record. Yes, Your Honor. I've never supervised a student before, as you can tell. That's OK. That's all right. She's a third year student at the University of Virginia School of Law, who's an intern with our office and the Federal Public Defender's Office. And so she's who you heard argument from today. Thank you. And my apologies. Oh, no problem. I just want to make sure I have two wonderful colleagues with me today. They are very proud of their being Virginia alums. Thank you so much for being. Thank you. I know you have time reserved. I want to make sure. Thank you. Thank you, Ms. Lawrence. Thank you, Your Honors. All right. Ms. Hudson, you may come up. Good morning. The court has noted this court's decision in Price really puts to rest the greatest extent of the appellant's argument regarding the circumstance specific approach for subsection I. And the government would argue that the language in Price goes further than that, although we acknowledge that the holding in Price was limited to subsection I. The court's discussion of the reasoning for why the circumstance specific approach applies to I supports the government's position that the circumstance specific approach also applies to subsections G and H. In particular, the Price court was focused on the distinction between subsections V.A. little Roman numeral I and V.A. little Roman numeral II, where subsection II does not contain the word elements and subsection I does. They found that very significant. And in addition, subsection VII overall makes no reference to the term elements. The Price court cited to the Eleventh Circuit's Dodge decision, which also added to that list of reasons, the fact that the title of subsection VII was an expanded definition of a specified offense against a minor, stating that it was intended to include all specified offenses meant to include all offenses by child predators. So that expanded definition was another reason that the court found the circumstance specific approach would apply to all of subsection VII, which would be G, H, and I. And then finally, and most importantly, in the Dodge decision, which the Price court cited, the Dodge court made clear that the language in subsection I was the fourth in the litany of reasons supporting their decision that the circumstance specific approach applied to subsection G. Yes, Your Honor. Take you back to I. Your position is that the circumstance specific analysis would be sufficient for I, correct? Yes, sir. As well as for G and H. So if we're using that, what is the conduct? What is the conduct that's against the minor? Because all you have to connect it, it says any conduct that buys nature is a sexual offense against a minor. What is the conduct? So, Mr. Mixell, and I think the district court made this clear in its decision below, the conduct was really twofold. First, he possessed the image, which was, in fact, child pornography. And secondly, the conduct, his offense conduct involved the sex abuse of a child, which, again, not just child pornography in particular, but the Oregon statute makes clear that in order to be convicted under that statute, it requires sex abuse of a child in the image. So what if it was anime? Anime can be child pornography. I can tell you in the Fourth Circuit, the cases that say cartoons can constitute child pornography. So what would be then the conduct? Because we don't know whether these images were cartoon or not, do we? Well, what I can say is that the — No, answer that first. No, first answer the question. On this record, do we know whether this motion picture, child pornography, was cartoon? The only way I can answer that is to say that Mr. Mixell's plea stated that he agreed that the image that he possessed reflected a child. A child. A child. It does. Cartoons can do that. They do it all. In the dark web. A cartoon could, but I would suppose that we wouldn't say that it was a child if it were a cartoon we were speaking of. The language said that it was a child. Yes, we do. In the Fourth Circuit, we say that cartoons can constitute child pornography. And I would just argue, based on this record, that although a cartoon may depict a child, when we say it was a child, it's not a cartoon. What it said was he possessed, by computer, a photograph or motion picture depicting child engaged in sexual act. So, you mean depicting means it has to be a real person? Is that what you mean? Well, what I wanted to refer the court — That's what he pled guilty to under this record. That's all we have. And there's another reference to it that was a motion picture. And then another says photograph, but it doesn't say — So, how is that resolved even under circumstance specific? How is that conduct against a child? How is that — In other words, for example, you know now we have artificial intelligence. They can show a motion picture and it never happened. And it doesn't look like a cartoon at all. It looks like people really doing it, but it's all in the science of motion picture technology. It never was a person at all in front of a camera. A child wasn't near it. It was in a studio. It came from a lab, photographic lab. So, you're saying that that is conduct and saying it has to be against a minor. No, minor's involved at all. They're all adults using technology. Well, my position is that on this record, looking at JA-33, the defendant specifically agreed that the photograph he possessed did depict a child engaged in a sexual act. And given that the Oregon statute requires child abuse in order to be guilty, I don't think he could possibly be guilty of the Oregon statute where an image was in fact a cartoon and in our view would not constitute child abuse even if it were a cartoon. It would not be child abuse. The Oregon statute says that a person who knowingly possesses or controls a visual recording of sexually explicit conduct involving a child and knows that the creation of the visually, sorry, the creation of the visual recording of sexually explicit conduct involved child abuse. So, I don't think you can have child abuse involving a cartoon. That's my position on this. So, we're interpreting the Oregon statute in that regard for a specific, right? In this case, that's my position that the offense to which he pled guilty given that he said it was a photograph depicting a child involved in a sexual act and where the Oregon statute requires that he knows or is aware of or consciously disregards the fact that the creation of the recording of explicit conduct, sexually explicit conduct involved child abuse, that it would eliminate cartoons in this case. Now, it sounds like you're doing a categorical analysis. We're supposed to interpret the federal statute, aren't we, for the specific conduct, isn't it? Did we go back to that? You're saying we should go back and analyze the Oregon statute for that purpose. Well, what I'm saying is to connect the dots that the court was asking about regarding whether or not anime could be included in this, I think you have to look at the Oregon statute and decide that it could not, in this case, have been a cartoon. But if the court is asking whether our position is that the circumstance-specific approach applies nonetheless to subsection G. But G is easier, isn't it? Yeah, G, it doesn't matter whether it's anime or not. Is that correct? It's still to be child pornography if it is child pornography. It simply says possession of child pornography. Right. And so our view, again, is the circumstance-specific approach applies to G, H, and I. And for the reasons we've discussed, we believe that this is conduct sufficient to establish that it was possession of child pornography under G. It was certainly conduct that by its nature is a sex offense against a minor and as well qualifies under H as criminal sexual conduct involving a minor. I'm sorry. Regarding the computer monitoring provisions that the court imposed in this case, the government's position I think is sufficiently presented in the brief, but our view, of course, is that the district court in this case did tailor this condition to the circumstances of this case. As Judge Agee has pointed out, it was only a five-year term of supervision. The defendant does have access to the Internet. He can speak. He can express himself. He can disclose his opinions to whomever he pleases. He's simply subject to the monitoring in this case for the reasons that the court set out in its opinion and in the hearing relating to the nature of this particular defendant's conduct. I think it was important in this case regarding the court's decision that Mr. Mikesell not only had possessed the computer image but had also absconded from supervision not only in Oregon, but in the Western District of Virginia in this case by removing his location monitoring device and had as well been previously convicted of failing to register as a sex offender as required. So for all of those reasons, in order to protect the public and to address the other goals of supervision, the condition in this case was appropriate, and we asked the court to affirm Judge Moon's decision in that regard. Ms. Hudson, you would agree that just outside of the context of probation, that monitoring your every activity with the computer is an extreme First Amendment surveillance, isn't it? Just monitoring your? Yes. I mean, outside of the context, I'm talking about just an ordinary citizen. Would you agree that would be an extreme surveillance of your First Amendment rights? Certainly I agree that computer monitoring of a citizen would at least begin to be an infringement, yes. It would be extreme, wouldn't it, in our society, wouldn't it? I mean, if the court's asking if there were? You're accessing your bank account, your friends, your political views, your thoughts, your love, your hate, your crying, your every emotion. I mean, people use the Internet. Wouldn't you agree that would be an extreme First Amendment surveillance or chilling effect? If there were absolutely no other connection to any reasoning, yes. All right. So then, so would you think that extreme First Amendment surveillance is not violated here because? Correct. Because he loses all those rights? It's certainly the case that a person on supervision does not, ipso facto, have no Fourth Amendment rights. I think that's clear from the court's precedents. First Amendment rights. Correct. But it's also true that a probationer and, in this case, more significantly, a person on supervised release who has served a term of incarceration and has been released has given up substantial amounts of privacy in that regard. And our position is simply that, in this case, the condition that the court imposed does not infringe on his First Amendment rights. He can say whatever he wants to say. He can access the Internet. He can communicate with people. He's simply being monitored for the purpose of determining whether or not he's continuing to engage in sexually criminal conduct. And in that regard, it's not an extreme imposition or infringement on his First Amendment rights. And, again, we think the district court got this right and should be affirmed. But that's the problem. You say it's just he has access. But in other regimes around the world, isn't that the most powerful part of the suppression, that everything you say is going to be monitored by the government? That's incredible, isn't it? Well, the way the court expressed it is not exactly how I would express it. Certainly the monitoring is taking place consistently, but the probation officer is only interested in looking at anything from that monitoring system that might fall within the court's condition prohibiting certain activity. So picking up Ms. Lorsch's example from her brief, where she compared this to a camera around the neck of a defendant recording his activities 24-7, it's really not that at all, where the monitoring is being done for these limited purposes described by the court at the sentencing hearing and in the documents that are associated with his condition as well. Yeah, but you're putting on that spin for this purpose. If it was that purpose, you would say, well, if you get on websites that involve children, involve pornography, the dark web, it's not specific at all. If you get on there to talk about your health situation, let's suppose you believe you have some symptoms of health and you go on to monitor the Mayo Clinic or NIH. Those things, I mean, those are very personal things, and they have implications in terms of a lot of things. The fact that government can look at all of that, is that necessary? I mean, can it be tailored? Don't you think they would be tailored in terms of what we're looking at? We want to make sure this person doesn't get a, you can't go to a school site. You can't Google a high school, elementary school. You can't, so it doesn't have to be dark websites. It could be all things, children, museums, whatever. But to tether to something that's anchored to the crime and the fear, but everything you get on the Internet for is monitored, and there's no limitation. Well, we're only looking for this, but we'll look at everything. Isn't there something wrong about that? I don't think there's anything wrong with what the court did in this case. And, again, looking at the remote com user agreement, where it specifies that Mr. Mikesell is not to search for, view, or download, and so forth, materials that include, but are not limited to, images of his victim, and images related to his crime or similar crimes, or images that depict individuals similar to his victims, e.g. children. And that, tied with the court's remarks, that the court was concerned about not only the fact that he had had a computer, but his essentially flaunting the law regarding the other regulatory requirements he was subject to. Clearly, in the government's view, the court has limited that intrusion to some significant degree. And I think further, if I'm not mistaken, I think the conditions of probation that were not just in the remote com agreement, but the explicit conditions of probation, I think, make even more clear that the probation officer is searching for evidence related to this offense. So we think the conditions are tailored sufficiently to address the constitutional concerns that Mr. Mikesell raises. And if there are no further questions, the government would rely otherwise on its briefs. Thank you, Counsel. Hello again, Your Honors. I have just a few points I'd like to make on rebuttal. So first, the government still hasn't explained why random, unannounced, suspicionless searches of computer and Internet usage by the defendant is not enough to protect the public and accomplish the other purposes of supervised release. If we look at the remote com user agreement in Section 21, it says, the defendant has to voluntarily waive any expectation of privacy from probation, parole, agencies, and other governments responsible for supervision, and this third-party company, Remote Com itself. And they have to inform others that their device is being monitored and that any communications with lawyers, doctors, and clergy members, which would normally be private and confidential, would be that they waive any expectation of privacy in that information. It seems like a potential chilling effect to someone trying to get help, for example. I agree. They wanted to talk to somebody about, let me work through these things. Instead, that could be used as, aha, you see, he talked to a therapist. This is hypothetical, of course. He talked to a therapist, and he's not making progress. You know, because we're in an area, well, not this case, but people spend long, long sentences, and when it's time to get out, then they make motions sometime that they can't get out because they're in danger forever. This is not the case. But this is a very touchy area in terms of who's looking at what you're doing, and they're listening to what you say to a counselor, those kind of things. Go ahead. Go ahead. Precisely. And I think, particularly in this circumstance where the defendant, one of the other conditions is that he undergo sex offender mental health assessments, the government already is going to have access to any private information about the difficulties that he's going through with trying to rehabilitate. And any further infringement on his rights to communicate with a doctor or a lawyer or clergy just isn't justified. And, again, we have no explanation from the government why random, unannounced, suspicionless searches by probation of his computer are not enough in this case. And then the second point I wanted to make was about Section G. So the cartoon, the anime hypothetical, shows why even if the circumstance-specific approach applies to G, the court should clarify the federal definition of possession of child pornography under SORNA and then remand to the district court to figure out whether the material here, we don't actually know if it was anime. It could have been anime. The definition of visual depiction under the Oregon statute includes a computer-generated image or picture produced by electronic, mechanical, or other means, which could certainly encompass cartoons. And even that shows, I would go further and say that that shows the difficulty of applying the circumstance-specific approach to G, because especially several years after the initial offense has occurred, we don't always know all of the details of what exactly was included in the images. So it would make more sense going forward for defendants to know the categorical approach applies to G and this state's offense fits within the federal definition of child pornography or doesn't. So for fair notice purposes, it would be beneficial if the circumstance-specific approach did not apply to G. It would just make more sense. That also helps show why H&I shouldn't be expanded to as sort of a catch-all for anything that might not fit in the federal generic offense of child pornography. The SMART guidelines also tell us that SORNA isn't meant to cover every single sex offense, but only the sex offenses that have been defined under SORNA. So specifically, it says the term sex offense is not used to refer to any and all crimes of a sexual nature, but rather to those covered by the definition of sex offense appearing in SORNA. So especially when we don't know what the content of the images was at this much later date, we shouldn't assume that we can just catch the offense under H&I even if it doesn't fit categorically within Section G.  Ms. Cervellas, before you leave the podium, I just want to say that thank you so much. Well, the cavaliers were well heard today, and you acquitted them very well. And, Ms. Lawrence, thank you so much for your involvement and your leadership with students. We appreciate that so much. Thank you. And, of course, Ms. Hudson- Thank you, Your Honor. Thank you. And Ms. Hudson, thank you for your very able representation of the United States here today. I regret that because of the circumstances of technology today, we won't be able to come down and greet you, but know that all of us and each of us appreciate your argument, and although we can't physically extend our hand, we do so with our hearts today and appreciate your argument. Well done. I'm going to ask Mr. Coleman to- We'll stand up here so you can see us. Yes, there you go. Thank you. Great. Thank you. It's all three of you. Mr. Coleman, if you would adjourn the court for the day, I'd appreciate it.
judges: Roger L. Gregory, G. Steven Agee, Barbara Milano Keenan